# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

KATINA EDMOND, o/b/o K.E.,

                                 Plaintiff,                       DECISION AND ORDER

vs.                                                        04-CV-6515

JO ANNE B. BARNHART, AS COMMISSIONER
OF THE SOCIAL SECURITY ADMINISTRATION,

                                 Defendant.

_____

## APPEARANCES

For the Plaintiff:                      Catherine M. Callery, Esq.
                                        Empire Justice Center
                                        80 St. Paul Street, Suite 660
                                        Rochester, NY 14604
                                        (585) 295-5727

For the Defendant:                   Terrance P. Flynn, United States Attorney
                                         By: Brian M. McCarthy, A.U.S.A.
                                        100 State Street, Room 620
                                        Rochester, NY  14614
                                        (585) 263-6760

## INTRODUCTION

**Siragusa, J**. This Social Security case is before the Court on plaintiff's motion (# 7) for a judgment reversing the Commissioner's decision and remanding for calculation of benefits or, in the alternative, for a new hearing, and the Commissioner's cross-motion (# 9), seeking judgment on the pleadings, both pursuant to 42 U.S.C. § 405(g). For the

reasons stated below, plaintiff's motion is granted, the Commissioner's decision is reversed and the matter is remanded for calculation of benefits.

## PROCEDURAL HISTORY

On June 15, 2001, plaintiff Katina Edmond, ("Edmond"), protectively filed an application for Supplemental Security Income payments on behalf of her son, K.E., a child under 18 years of age. She alleged that K.E. became disabled as of August 7, 1998. (Record ("R.") at 93.) The claim was initially denied, and although Edmond's request for hearing filed on February 15, 2002 was untimely filed (R. 69),  the Administrative Law Judge ("ALJ") found that good cause existed for late filing of the hearing request. (R. 14.) A hearing was scheduled for December 10, 2003, but the applicant and the claimant were not present, so no testimony was taken, and another hearing was scheduled for April 21, 2004. (R. 27, 28.) At that hearing, both Edmond and K.E. appeared and testified before ALJ Bruce R. Mazzarella. (R. 30.) On May 4, 2004, the ALJ issued his decision, finding that K.E. was not disabled and, consequently, denying benefits. (R. 11, 23.)

Edmond then filed a timely request for review by the Appeals Council on behalf of the claimant. On August 23, 2004, the Appeals Council affirmed the decision of the ALJ (R. 4.) Accordingly, the hearing decision became the final decision of the Commissioner. On October 21, 2004, Edmond filed a complaint *in forma pauperis*, alleging that the Commissioner's determination that K.E. is not disabled is based upon an error of law. (Compl. at 3.)

**MEDICAL HISTORY**

K.E. was born on August 7, 1998 and is now almost 8 years old. At the time of the hearing, he was five years old and enrolled in regular kindergarten at Autumn Lane Elementary School in the Greece Central School District, K.E. received resource room help and speech and occupational therapy. (R. 15, 270.)

On August 28, 2001, Edna Carter Young, Ph.D., Chief of Speech Pathology and Associate Professor of Pediatrics at the University of Rochester, administered the Preschool Language Scale-3 (PLS) test to K.E. (R. 178-81.) He scored a 66 on the receptive language scale and a 71 on the expressive language scale. His standard score was a 71, placing him in the third percentile –  with an age equivalence of 22 months. Dr. Young wrote that this "represents a severe delay in all parameters of language." (R. 179.) Dr. Young also reported that K.E. took the Goldman-Fristoe Test of Articulation, on which he received an error score of 41. (R. 180.) She reported that K.E.'s development of consonants and clusters was moderately to severely delayed, but that his development was following a typical pattern (as his errors were typical of errors made by young children), yet at a delayed rate. (R. 180.) Dr. Young concluded that K.E.'s test results, "indicate an overall delay in language skills of more than one year." (R. 179.) She recommended that K.E. be provided with an overall approach to language with goals for both comprehension and expression of language, both areas in which he was delayed. (*Id.*) Dr. Young also stated that K.E. "could also profit from emphasis on improving attending behavior and social skills." (R. 179.) She recommended pragmatic language training along with oromotor therapy to improve the tone of the lips, tongue, and cheeks, and also recommended that normal nasal breathing should be part of his therapy. (R. 179.)

On October 11, 2001, K.E., then three years and three months old, underwent a consultative pediatric examination with Ramon Medalle, M.D., on a referral from the Division of Disability Determination. (R. 182-85.) Dr. Medalle diagnosed K.E. with attention deficit disorder ("ADD"), but determined that his prognosis was "[s]table." (R. 184.) He concluded that K.E. had no apparent physical limitation.

Concurrent with Dr. Medalle's examination, K.E. was given a consultative Psychiatric and Intellectual Evaluation by John Thomassen, Ph.D. (R. 186-90). K.E. was administered the Bayley Scales of Infant Development-2nd Edition. He received a mental developmental index of 62 with a 95% probability. His true score was between 57 and 75, placing him in the 26-month range of development and in the mild range of mental retardation. (R. 187.) On the Mental Status Exam, Dr. Thomassen noted that K.E. related adequately with the examiner and was cooperative during the examination. Dr. Thomassen noted further: that K.E. appeared his stated age, was casually dressed and adequately groomed; that he was of average height and weight, and had variable eye contact with the examiner; that he was extremely active and was beating up a blown up surgical glove in a violent manner, to the point where the air was expelled from the glove; and that he was often making loud noises and appeared to be overactive. (R. 188.) Concerning speech, Dr. Thomassen observed that K.E. had some speech pronunciation problems which rendered his speech unintelligible at times. (*Id.*) As to K.E.'s thought processes, Dr. Thomassen wrote: that K.E. was coherent and goal-directed with no evidence of thought disorder; that his affect was labile and his mood was neutral; that his sensorium was clear as he was awake and alert; that his orientation was impaired as he stated the date was two instead of three; that his attention and concentration were somewhat fleeting as per his behavior during the

examination; that his recent and remote memory skills were impaired as he could only recall one of three objects immediately and none of the three after five minutes; and that he could only recall two digits forward. In his cognitive functioning, Dr. Thomassen estimated that K.E. was in the mild range of mental retardation. (R. 189.) Dr. Thomassen diagnosed K.E. with Disruptive Behavior Disorder (DSM-IV code 312.9), ruled out Attention Deficit/Hyperactivity Disorder (ADHD) (code 314.01), Phonological Disorder (code 315.39), and Mild Mental Retardation (code 317.0). Dr. Thomassen stated that K.E. would likely benefit from early intervention and special education services, as well as some family counseling, which he was receiving, with a parent counseling component to help contain his behavior and promote prosocial behaviors. Nevertheless, Dr. Thomassen's prognosis for K.E. was guarded given his multiple areas of difficulty. (R. 190.)

Additionally, on the same day, October 11, 2001, K.E. underwent a speech and language evaluation with Speech and Language Pathologist Dawn M. Grasso, M.S., CCC-SLP. (R. 191-94.) K.E.'s language was evaluated on the Preschool Language Scale - III (PLS). The results indicated that K.E. had a moderate receptive and expressive language delay.  Further, Ms. Grasso noted that "[a]s he did not appear to be attempting testing tasks to the best of his abilities, the results obtained at this time do appear to be true and valid." (R. 192.) Ms. Grasso also administered the Goldman-Fristoe Test of Articulation to assess K.E.'s articulation skills at the word level. His 27 errors put him in the 37th percentile when compared to boys his age. Ms. Grasso diagnosed K.E. with moderate expressive and receptive language delay and moderate articulation delay. She recommended that K.E. would benefit from speech and language therapy services, adding that "the results obtained at this time do appear to be consistent with K.E.'s allegations."

(R. 194.)

On October 24, 2001, a Childhood Disability Evaluation Form was completed by Jennifer Meyer, M.D. (R. 195-200.) She evaluated K.E. as having: a "marked" impairment in the domain of Acquiring and Using Information; a "less than marked" impairment in Attending and Completing Tasks, Interacting and Relating to Others, and Caring For Yourself; and "no limitation" in Moving About and Manipulating Objects, and Health and Physical Well-Being. Where the form asks the evaluator "Does the impairment or combination of impairments functionally equal the listings?" Dr. Meyer designated, "No." (R. 200.)

On October 31, 2001, K.E. was evaluated by Maria C. Gonzalez, Ph.D., certified school psychologist for the Rochester City School District. Dr. Gonzalez completed a Psychological Evaluation. (R. 209-13.) She administered the Differential Ability Scales (DAS) test, and found K.E. to be functioning within the very low range of cognitive ability. Verbal skills fell in the low range and nonverbal skills fell within the very low range. K.E. demonstrated significant delays across most areas measured. She also noted in her report that the Vineland Adaptive Behavior Scales suggested overall delays with K.E.'s adaptive behaviors and that he had significant delays in the area of communication. Dr. Gonzalez stated that at that time, K.E. did not present with any significant behavioral difficulties. She reported that K.E. would probably benefit from the services of speech and language therapy. Also, Dr. Gonzalez noted that K.E. could benefit from a program that addressed his cognitive delays. (R. 212.)

On November 7, 2001, K.E. underwent a Psychosocial Assessment by a Certified School Social Worker[1] at Pinnacle School # 35 prior to his entrance at Corpus Christi School, where he was to begin preschool the next day. (R. 204-08.) After reviewing K.E.'s history, as related by his mother, the school social worker concluded, "[c]ounseling not indicated at this time . . . . Maintain open communication with district staff." (R. 208.)

Nearly two years later, on August 18, 2003, Jennifer Todd, M.D., completed a Childhood Disability Report about K.E. (R. 225-27.) Her diagnosis was, "[s]peech delay; [d]evelopmental delay– mild; r/o ADHD–diagnosis not confirmed." (R. 225.) Dr. Todd found that K.E.'s communication skills, cognitive skills, and social/emotional skills were not age-appropriate. In these areas, she found that K.E. was functioning at age 3 yrs 9 mos, 3 yrs 6 mos, and 3 yrs 6 mos, respectively. (R. 225.) Dr. Todd noted that K.E. was to have a formal evaluation by "CPSE" in September. (R. 225.)

In October[2] 2003,  Jan Steehler, M.S., Speech-Language Therapist for Autumn Lane Elementary School in the Greece Central School District, completed an "Evaluation Report of  Speech and Language Skills." (R. 252-57.) In that regard, K.E.'s receptive language skills were found to be moderately delayed, when compared to others of the same age. Moderate to severe delays were reported in his expressive language skills. K.E. experienced word retrieval difficulties, and needed "wait time" before responding to questions asked of him. Overall auditory processing skills were evaluated to be in the developmentally delayed range. K.E. was observed to present with mildly delayed

---

[1]The social worker's name is handwritten and illegible, but might be "E. Reyes, C.S.W." (R. 208.)

[2]The exact date of the evaluation is not given. (R. 252.)

articulation/phonological skills, with connected speech as being much more difficult to understand. (R. 257.) Ms. Steehler recommended: (1)  that K.E. receive speech and language therapy for thirty minutes three to four times each week for the 2003-2004 school year; (2) that K.E.'s test results should be shared with parents and with the teachers that work with him at Autumn Lane School; and (3) his parents be provided with strategies to use to assist him in school. (R. 257.)

On October 30, 2003, Monica Devine, M.S., completed a "Children's [sic] SSI Functional Assessment Form." (R. 231-35). Ms. Devine reported that K.E.'s impairments had a "marked" effect on his functioning in an age appropriate manner with regard to his intellectual skills, oral communication, fine motor skills, social behavior, and caring for his own personal needs. She also listed his ability to complete tasks in a timely and age appropriate manner as "unknown."

On November 5, 2003, Dolores Behrouzy-Far, O.T.R. completed an Occupational Therapy Evaluation of K.E. (R. 259-62.) She concluded that K.E.

> is a delightful child whose receptive language difficulties are so challenged that he functions best if the auditory demands are kept to a minimum and the instruction is delivered in a slow kinesthetic, visual style, with an occasionally visual or tactile cue. Expressive language was so fragmented that it was difficult to understand at times. He had very few concepts to build upon his general knowledge bank. However, he is a child who is ready to learn. In a one-on-one testing situation he was very engaged in hands-on activities, he wanted to be independent and successful, he had a very high threshold for failure, and he was very persistent with very little praise. He would benefit from a smaller classroom setting where the instruction could be delivered in a small kinesthetic-tactile-visual small group. His auditory confusion could be immediately addressed and new skills and concepts rehearsed until he has a repertoire of knowledge and references to be successful within the regular education classroom setting . . . .

(R. 261.) In her recommendations, Ms. Behrouzy-Far wrote that,

> Direct Occupational Therapy is not recommended at this time because intervention would not be adequate to meet all of Kevin's needs. However, consultative OT[3] services to the special education teacher and other teachers would be helpful . . . . Communication was the most problematic issue during this assessment and needs to be intensely addressed throughout his day. Modifying auditory demands so that Kevin understands what is expected of him will also be a considerable feat and needs a unified systematic approach to insure the most success within a short period of time . . . .

(R. 262.)

On November 13, 2003, K.E.'s kindergarten teacher, Kristin Bates, at the Autumn Lane Elementary School in the Greece Central School District completed a School Performance Questionnaire about him. (R. 265-69.) In that questionnaire she was asked whether K.E. executed certain functional skills in an age-appropriate manner. She was then instructed to rate K.E.'s level of functioning on a scale of 1-4, with 1 meaning "no impairment", 2 meaning "less than marked" impairment, 3 meaning "marked" impairment, and 4 meaning "extreme" impairment. The terms "marked" and "extreme" are defined in the Instructions For Completing School Performance Questionnaire (R. 264) as follows:

> "Marked"- The degree of limitation interferes seriously with the child's ability to function- in one or several activities- independently, appropriately, and effectively in an age-appropriate manner and, when applicable, on a sustained basis. When standardized tests are used, a valid score that is two or more standard deviations below the norm is considered 'marked'. 'Marked' may also be used to describe an impairment that is more than moderate but less than "extreme."

> "Extreme"- The degree of limitation interferes very seriously with the child's ability to function in an age-appropriate manner and, when applicable, on a sustained basis in one or several areas of functioning. Three standard deviations below the norm is also considered extreme. Generally speaking, a rating of "Extreme" should be reserved for the most severe impairment(s) and functional deficits. However, 'Extreme' does not mean a total loss or lack of ability to function.

---

[3]Presumably "occupational therapy."

(R. 264.) Ms. Bates wrote that K.E. did not display age-appropriate skills in acquiring information, using information, communication skills, interacting and relating to others, attending to tasks, and completing tasks (R. 265-68). She noted that with regard to acquiring information, K.E. showed a "marked" impairment learning new material. K.E. displayed an "extreme" impairment reading and/or comprehending written material, comprehension and/or following oral directions, and speech/language necessary for learning (R. 265). In the using information category, Bates rated K.E. as having "marked" impairments recalling and applying previously learned material and effectively using problem solving skills; K.E. had "extreme" impairments in effective communication of learned material and effective expression of ideas (R. 265). Concerning his communication skills, Ms. Bates wrote that K.E. had "marked" impairments expressing basic wants and needs, and "extreme" impairments in his conversational skills, ability to relate/retell stories, and receptive language skills (R. 266). K.E.'s ability to interact and relate to others was marked as not age-appropriate because he had "less than marked" impairments regarding his ability to get along with other children, share/take turns, follow class rules, and making/keeping friends (R. 267). In rating K.E.'s ability to attend to tasks in an age-appropriate manner, Ms. Bates was asked to rate the severity of K.E.'s impairment in each area. She marked as "extreme" his impairments in the following areas: easily distracted, needs frequent redirection, requires much supervision, overactivity and restlessness, and impulsivity. (R. 268.) With regard to completing tasks, Ms. Bates rated K.E. as having "no limitation" in frustration tolerance; she indicated that K.E. had "marked" impairment maintaining age-appropriate pace; she rated K.E. as having "extreme" impairments carrying out instructions and completing tasks on time. (R. 268.)

Ms. Bates indicated that K.E. was able to move about and manipulate objects in an age-appropriate manner and that his self-care and physical health functioning were age-appropriate (R. 266, 267.) Concerning K.E.'s ability to move about and manipulate objects, Ms. Bates rated K.E. as having "no limitations" in his Gross Motor Skills (*i.e.* walking, running, jumping) and Coordination (*i.e.* balance, ball sports). K.E. was rated as having "less than marked" limitations in his Fine Motor Skills (*i.e.* writing, cutting, coloring). (R. 266.) In the area of the questionnaire concerning his self-care and physical health, Ms. Bates indicated that K.E. had "no limitation" in the following areas: injurious or hurtful behavior to self or others, disregard for safety rules, and poor hygiene or self-care skills. (R. 267.)

**ANALYSIS**

***The Standard for Finding a Disability***

The issue here is whether K.E. is eligible to receive child's Supplemental Security Income payments pursuant to section 1614(a)(3)(C) of the Social Security Act. The Commissioner's regulations for determining a child's disability set forth a three-step sequential evaluation process. See 20 C.F.R. § 416.924 (2000); 58 FR 47577 (Sept. 9, 1993), as amended at 62 FR 6421 (Feb. 11, 1997); 65 FR 54778 (Sept. 11, 2000). The first step is to determine whether the child is working at the level of "substantial gainful activity." If so, the claim is denied. If the child is not working, the claim then proceeds to the second step of the evaluation. See 20 C.F.R. §§ 416.924 (a),(b). At this step, the Commissioner determines whether the child has a "severe" impairment, defined as more than a "slight abnormality or combination of slight abnormalities" that causes "more than

minimal limitations." 20 C.F.R. §§ 416.924 (c). A claim that satisfies this *de minimis* standard proceeds to the third and final step: whether the child has an impairment or combination of impairments that "meet, medically equal, or functionally equal in severity a listed impairment . . . ." 20 C.F.R. § 416.924 (d).

### The Standard of Review

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). It is well settled that

> it is not the function of a reviewing court to determine de novo whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are sup-port-ed by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 231-32. Consequently, if the ALJ's findings are supported by substantial evidence and the correct legal principles were applied, the findings will be sustained even where substantial evidence may support the claimant's position and despite the fact that the Court, had it heard the evidence *de novo*, might have found otherwise. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *Campbell v. Barnhart*, 178 F. Supp. 2d 123, 128 (D. Conn. 2001). On appeal from a final decision of the Commissioner, the Court may "enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing" the Commissioner's decision "with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

When the administrative record contains gaps requiring further development of the evidence, or when the ALJ has applied an incorrect legal standard, the usual course is to remand the case to the Commissioner for further proceedings.  *See Rosa v. Callahan*, 168 F. 3d 72, 82-83 (2d. Cir. 1999).  However, when there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision," the Court may reverse the Commissioner's decision and remand solely for a calculation of benefits. *Id.* at 83; *see also, Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000).

### *The ALJ's Decision*

At step one of the sequential analysis, the ALJ determined that K.E. is a minor child who has never engaged in substantial gainful activity.  (R. 22.)  At step two, the ALJ determined that K.E. had severe impairments consisting of attention deficit disorder, developmental delays, speech delays, and fine motor delays.  (*Id.*) At step three, he concluded that K.E.'s severe impairments did not meet or medically equal the severity of any impairment listed in Part B of Appendix 1 to Subpart P of Part 404, 20 C.F.R. ("Subpart P"). (R. 22.)

### *Discussion*

Plaintiff's counsel asserts that the evidence in the record shows that K.E. meets two of the Subpart P listings.  First, plaintiff's counsel maintains that K.E. has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."  Subsection D of § 112.05 Appendix 1 to Subpart P of Part 404 – Listings of Impairments (Jul. 1, 2005), 20 C.F.R.; (Pl.'s Mem. of law at 15).  Second, plaintiff's counsel argues that K.E. "also meets Listing 112.05E , which requires a valid verbal, performance, or full scale IQ of 60 through 70 and

for children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d fo 112.02 . . . . [K.E.] has a marked impairment in his ability to attend and complete tasks, thus fulfilling §B2d of 112.02.  That combined, with is mental retardation, meets 112.05E." (Pl.'s Mem. of Law at 15 n.11.).

In support of her arguments, plaintiff's counsel asserts that K.E.'s IQ falls within the range of 60 through 70.  (Pl.'s Mem. of Law at 15.)  However, the ALJ's decision stated only that K.E.'s "true score fell somewhere between 57 and 76, thus placing K.E. in the mild range of mental retardation." ( R. 17; *see also* R. 187 (Dr. Thomassen's report).) Relying on the definition contained in the *Diagnostic and Statistical Manual to Mental Disorders* (4th ed., text rev.) (DSM-IV TR) 42, plaintiff's counsel further argues that in order to sustain a diagnosis of "mild" mental retardation, one would have to have an IQ score between 55 and 70. (Pl.'s Mem. of Law at 15-16). The AlJ's decision, though, appears to find that K.E.'s IQ score fell above the IQ range described in Listing § 112.05D, but does not explain why, other than to say that, Dr. Thomassen, a consultative examiner, stated, in his report that the test he used on K.E., the Bayley Scales of Infant Development, 2nd Edition, showed a mental development index of 62 with a 95% probability. (R. 17, 187.) However, what Dr. Thomassen actually stated was that, "[h]is true score lies between 57 and 75." (R. 187.) While, the term, "score," is not defined, Dr. Thomassen states in conjunction with his diagnosis that this score places K.E. "in the mild range of mental retardation." (*Id.*) Plaintiff's counsel contends that the Bayley test used by Dr. Thomassen, with a mean of 100 and standard deviation of 15, is the same type used by the

Commissioner.[4] (Pl.'s Mem. of Law 15-16).  The Commissioner does not dispute plaintiff's counsel's contention that Dr. Thomassen's diagnosis of mild mental retardation means that K.E.'s IQ is in the range of 55 to 70, or that such range is within or below the range of the listing.

In addition to her argument that K.E. meets the IQ range in § 112.05D, plaintiff's counsel also contends that K.E. suffers from other mental impairments imposing additional and significant limitations of function, including learning disabilities and ADHD. The Court notes that the ALJ found that K.E.'s attention deficit disorder, developmental delays, speech delays, and fine motor delays are all "severe" impairments within the meaning of 20 C.F.R. § 416.925(c) and Social Security Rulings (SSR) 96-3p and 85-28.  (R. 15.) Plaintiff's counsel further argues that these severe impairments constitute the secondary impairments required by listing § 112.05D. (Pl. 's Mem. of Law at 16.) Plaintiff's counsel maintains, and the Commissioner does not dispute, that the Commissioner has acknowledged that an impairment or combination of impairments constituting a "severe" impairment under the sequential evaluation should be considered "significant" under § 112.05C (the adult equivalent to listing § 112.05C).  In support of this contention, plaintiff's counsel cites to 65 F.R. 50784 (Aug. 21, 2000), in which the Commissioner states:

---

[4]        9.      Identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning.  The IQ scores in Listing 112.05 reflect values and a standard deviation of 15, *e.g.*, the Wechsler series. IQs obtained from standardized tests that deviate significantly from a mean of 100 and standards deviation of 15 require conversion to a percentile rank so that the actual degree of limitation reflected by the IQ scores can be determined.  In cases where more than an IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with Listing 112.05.

The final rules revise section 12.00A to state explicitly that when we adjudicate a claim under Listing 12.05C, we will assess the degree of functional limitation the additional impairment imposes to determine if it significantly limits an individual's physical or mental ability to do basis work activities, i.e., is a severe impairment as defined in 20 C.F.R.. § 404.1520(c) and 416.920(c). We have also revised section 12.00A of the Listings to restate our policy that, if the additional impairment does not cause limitations that are "severe" as defined in 20 C.F.R. § 404.1520(c) and 416.920(c), we will not find that the impairment imposes an "additional and significant work-related limitation of function" under Listing 12.05(c), even if the individual is unable to perform his or her past work because of the unique features of that work.

65 F.R. 50784. The Court agrees that Listing § 12.05C, which states, "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," is equivalent to Listing § 12.05D, which states "[a] valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." Consequently, the Court finds that the language in 65 F.R. 50784, quoted above, shows that the Commissioner considers a "severe" impairment to be the equivalent of a "significant" limitation for the purposes of Listing §112.05D. The same determination was reached by the district court in *Brown v. Comm'r of Soc. Sec.* , 311 F. Supp. 2d 1151 (D. Kan. 2004):

> [a] finding that a child has a additional impairment (besides low I.Q.), and that this impairment is "severe" under 20 C.F.R. § 416.924(c), means that the impairment satisfies the Listing 112.05D requirement of an impairment imposing an "additional and significant limitation of function."

*Brown*, 311 F. Supp. 2d at 1158; *see also Hall ex rel. Lee v. Apfel*, 122 F. Supp. 2d 959 (M.D. Ill. 2000) (relying on the *Childhood Disability Evaluation Issues*, Social Security Administration Office of Disability, SSA Pub. No. 64-076 (March 1998) at 49 & n.3, for the

proposition that a "significant limitation" does not have to be at the 'marked' level."). In addition, plaintiff's counsel submits, and the Commissioner does not dispute, that K.E.'s ADHD is an impairment separate and distinct from his mental retardation, citing to *Matthews ex rel Dixon v. Barnhart*, 339 F. Supp. 2d 1286, 1293 (N.D. Ala. 2004), and *Witherspoon v. Massanari*, 228 F. Supp. 2d 1041, 1047-48 (E.D. Mo.). In each of the two cited cases, the district court used a diagnosis of ADHD as a secondary impairment under Listing § 112.05D.

Therefore, the Court concludes that the ALJ misapplied Listing § 112.05D and his finding that K.E. does not meet it is not supported by substantial evidence. Accordingly, the ALJ's determination on this point is reversed.

Plaintiff's counsel also argues that K.E. meets Listing §112.05E.  A child functionally equals a listing impairment if he has an "extreme" impairment in one of six areas of function, or a "marked" impairment in two of six areas of functioning.  The six areas of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) self-care; and (6) health and physical well-being. 20 C.F.R.  § 416.926a(b)(1)(i-vi)(2005); 62 F.R. 6424 (Feb. 11, 1997); 62 F.R. 13538, 13733 (Mar. 21, 1997), as amended at 65 F.R. 54782 (Sept. 11, 2000); 65 F.R. 80308 (Dec. 21, 2000); 66 F.R. 58045 (Nov. 19, 2001).  Plaintiff's counsel argues that although the ALJ determined that K.E. has a marked impairment in the domain of acquiring and using information, he erred in failing to find that K.E. has an extreme impairment in the domain of acquiring and using information, or alternatively, an additional marked impairment in attending and completing tasks. (Pl.'s Mem. of Law at 18.)

Turning first to the domain of acquiring and using information, the Commissioner must consider how well a child acquires or learns information, and how well he can use the information he has learned. 20 C.F.R. § 416.926a(g). The Commissioner's rule provides that a child of K.E.'s age,

> should begin to learn and use the skills that will help you to read and write and do arithmetic when you are older. For example, listing to stories, rhyming words, and matching letters are skills needed for learning to read. Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed in learning to write. Using words to ask questions, give answers, follow directions, describe things, explain what you mean, and tell stories allows you to acquire and share knowledge and experience of the world around you. All of these are called "readiness skills," and you should have them by the time you begin first grade.

20 C.F.R. § 416. 926a(g)(2)(iii). Plaintiff's counsel contends that the Commissioner erred in finding that K.E. has only a marked limitation in this domain and that the record supports a finding that this limitation is extreme. (Pl.' s Mem. of Law at 19.)

Relying on several tests, the ALJ found that "the combination of mild mental retardation, speech delays, mild fine and gross motor delays, and attention deficit disorder (now improved with medication) support a finding of a marked limitation in the claimant's ability to acquire and use information." R.18) However, plaintiff's counsel points out that the ALJ evidently disregarded information from K.E.'s teacher, Ms. Bates, who rated his abilities to acquire and use information, as well as his communication skills, as extremely impaired in most[5] categories. (R. 264-65). Ms. Bates indicated in the School Performance Questionnaire, referred to above, that K.E. does not acquire information or use information

---

[5]The Commissioner's regulations do not require that *all* activities or functions within a domain be restricted in order to be found to have a marked or extreme limitation in that domain. 20 C.F.R. §§ 416.926a(e)(2)(I), 416.926a(e)(3)(i).

in an age-appropriate manner and specifically that he had extreme limitations in reading and/or comprehending written material, comprehending and/or following oral directions and speech/language necessary for learning, as well as extreme limitations in effective communication of learned material and effective communication of learned material and effective expression of ideas. (R. 265.) She noted that his "limitations do impact classroom performance." (R. 265.) Her opinion is corroborated by an October 2003 Speech and Language Evaluation, which found K.E.'s expressive language skills moderately to severely delayed. (R. 255.)

The Commissioner encourages the use of non-medical evidence provided by a teacher, who works with a child on a daily basis and observes him in a social setting with peers as well as adults.  The regulations specifically state that, "[p]roblems in social functioning, especially in the area of peer relationships, are often observed firsthand by teachers . . . . [S]chool records are an excellent source of information concerning function . . . ." 20 C.F.R. Par 404, Suppt. P, App 1, Listing 112.00.C.3 (Mental Disorders-Assessment of Severity); *see also Matthews o/b/o Dixon*, 339 F. Supp. 2d at 1290, n.8 (teacher is an expert on school functioning and behavior).  Further, the Second Circuit relied on teachers' reports in *Quinones on Behalf of Quinones v. Chater*, 117 F.3d 29, 35 (2d Cir. 1997), where the panel observed,

> We think that the reports of the psychologists are at best inconclusive with respect to Jennifer's concentration, persistence, and pace.  Standing against the reports of Jennifer's teachers, who dealt with her on a daily basis over at least a school year, these reports do not by themselves amount to "substantial evidence" supporting the Commissioner's finding.

The Court finds that the ALJ erred by not considering the report of K.E.'s teacher in making his determination that K.E. has only a marked limitation in the domain of

acquiring and using information. Accordingly, the ALJ's decision on this point must be reversed.

In the domain of attending and completing tasks, the ALJ related that K.E. had "just begun to take appropriate medication for ADD," and concluded that his teacher's November 13, 2003 opinion that K.E. had extreme limitations in carrying out instructions and completing tasks on time was based on his "performance without the benefit of medication . . . ." (R. 19.)  In the Performance Questionnaire, Ms. Bates noted that K.E. had extreme limitations in that he is easily distracted, needs frequent redirection, requires much supervision, experiences overactivity and restlessness, and acts impulsively.  (R. 268.)   As contrary evidence, the ALJ cited to the Evaluation Report of Speech and Language Skills completed by Jan Steehler, M.S., in October 2003.[6]  In that evaluation report, Ms. Steehler noted in the section entitled "Behavior" that:

> [K.E.] attended the sessions willingly.  He worked through the test sessions and responded well to verbal praise and reinforcement.  He was comfortable and familiar with his surroundings at school during the testing. Idea [sic] conditions were provided, a 1:1 situation, close proximity to the evaluator, no time pressures, minimal distractions and subtest presentation was dispersed over therapy sessions to avoid fatigue. [K.E.] maintained fair attention for most of the testing.  If he was distracted, most of the time he could [sic] pulled back to the task at hand.

(R.253.)   Essentially, Ms. Steehler's report supports the conclusion that under ideal conditions, which she described in detail, K.E. could maintain fair attention and when distracted, most of the time he could be pulled back to the task at hand.  This is hardly substantial evidence in support of the ALJ's conclusion that K.E. suffered only a "less-than-marked" limitation in the domain of attending and completing tasks. (R. 19.) The

---

[6]The exact date is not noted in the report.

Commissioner also relies on a portion of Maria C. Gonzalez's psychological evaluation of K.E., dated October 31, 2001.  In her report, Ms. Gonzalez states that K.E. "presents as a sweet and cooperative little boy . . . ." (R. 212.)  However, this assessment was made two years before Ms. Bates, K.E.'s teacher, assessed him and is lacking in an factual recitation to support Ms. Gonzalez's "sweet and cooperative" opinion.

The ALJ and the Commissioner also noted that Edmond, K.E.'s mother, testified that his inattention was "somewhat" improved since he has been taking Ritalin, which he started taking in October 2003.  However, the dosage had to be lowered because he was experiencing side effects.   (R. 45, 231) Plaintiff's counsel argues that the ALJ has impermissibly relied on his own speculation that Ritalin, at therapeutic levels, would substantially improve K.E.'s abilities in this domain.   This Court has held that, "[i]n analyzing a treating physician's report, 'the ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion' nor can she 'set [her] own expertise against that of a physician who submitted an opinion or testified before [her].'" *Gilbert v. Apfel*, 70 F. Supp. 2d 285, 290 (W.D.N.Y. 1999) (quoting *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)) (other citations omitted).  Instead, if the ALJ determines the evidence is insufficient, then "t is the ALJ's duty to fully develop the record." *Johnson v. Barnhart*, 312 F. Supp. 2d 415, 426-427 (W.D.N.Y. 2003), *citing Perez v. Chater*, 77 F.3d 41, 47 (2d. Cir. 1996). If the ALJ had chosen to use a medical advisor, that advisor would not be permitted to comment on what other medical doctors determined without having examined K.E. *See Pagan ex rel. Pagan v. Chater*, 923 F. Supp. 547, 555 (S.D.N.Y. 1996). Thus, the ALJ here could not consider what he thought would be the effect of K.E.'s medication on his abilities in the domain of attending and completing tasks.

The Court agrees that the ALJ's determination that K.E. had a "less-than-marked" limitation in the domain of attending and completing tasks is not supported by substantial evidence. Accordingly, the ALJ's determination on this point is reversed.

Plaintiff has asked that the Court reverse the Commissioner's decision and remand the case for calculation of benefits, or, in the alternative, remand the case for a new hearing. The Second Circuit stated in *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (citation omitted), that "we have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." The Court concludes that no useful purpose would be served here by a remand for the development of further evidence or a review of the evidence applying the proper standards. The record contains substantial evidence that K.E. meets or exceeds Listing § 112.05D and is, therefore, entitled to benefits.

## CONCLUSION

For the reasons stated above, the Commissioner's decision is reversed. The case is remanded for calculation of benefits.

IT IS SO ORDERED.

Dated:       August 9, 2006
             Rochester, New York


                      ENTER.


                      /s/ Charles J. Siragusa_____
                      CHARLES J. SIRAGUSA
                      United States District Court